UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tyron Anderson,

Plaintiff,

v.

Civ. No. 01-1768 (JEL/JGL)
ORDER

Sears, Roebuck and Co.,

Defendants.

---

Jeffrey A. Carson, Esq., Carson, Clelland & Schreder, appeared for Plaintiff Tyron Anderson.

Thomas E. Marshall, Esq., and Paul A. Egtvedt, Esq., Jackson Lewis LLP, appeared for Defendant Sears, Roebuck and Co.

---

This is an employment discrimination action brought by Tyron Anderson against his former employer, Sears, Roebuck and Co. (Sears). Anderson, who is African-American, claims that Sears violated the Minnesota Human Rights Act, Minn. Stat. ch. 363 (2000) (MHRA), by requiring him to perform an excessive amount of work and discharging him because of his race. The matter comes before the Court on Sears's Motion for Summary Judgment and Motion to Strike one of Anderson's opposing affidavits. For the reasons given below, the Court grants both motions.

## I. SUBJECT MATTER JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a)(1), 1441 (2000).

## II. BACKGROUND

Anderson worked as a Sears service technician from July 26, 2000, to March 2, 2001. Sears assigned Anderson a company-owned van to respond to service calls from customers in the

FILED NOV 0 8 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED NOV 0 8 2002
DEPUTY CLERK'S INITIALS

Twin Cities metropolitan area. Anderson's supervisor, Barry Merritt, instructed him during orientation that the van was exclusively for company use. Although Merritt did not tell Anderson that a violation of this rule was grounds for discharge, Anderson thought it was "a given" that he would lose his job if he used the van for other purposes.

Anderson worked the day shift from July 2000 until November 2000. He worked from 8:00 a.m. to 4:30 p.m. four days per week, and from 10:00 a.m. to 7:00 p.m. one day per week. In addition, Anderson and the other service technicians were required to be "on call" for a week on a rotating basis.

In August 2000, Anderson convinced his friend, Gary Harris, to leave his job at Minnegasco to work for Sears as a service technician. Anderson and Harris had gone to school together in Saint Louis, Missouri, and had worked together at Minnegasco. Harris, like Anderson, is African-American. Harris agreed to work a night shift from 3:00 p.m. to midnight, Monday through Friday. Merritt asked Anderson to join Harris in working the night shift, and Anderson agreed to do so in exchange for a raise of two dollars per hour. Having Anderson and Harris on the night shift made it unnecessary for the other service technicians, all of whom were white, to be on call on weekdays. Instead, the other service technicians would be on call only on the weekends on a rotating basis.

Anderson started working the night shift in November 2000. Within the first two weeks, Anderson asked Merritt to change his schedule because the night shift involved too much work and too large of an area for two people to cover. According to Anderson, Merritt told him to "give it a little more time." Anderson and Harris made further complaints to Merritt about the amount of work they had to perform on the night shift, including complaints about being paged for emergency calls after their shifts ended at midnight. In response, Merritt told them that the

other service technicians did not want to go back to the old on-call system, and that it would be difficult to rearrange everyone's schedule if they were to switch back to the day shift.

In December 2000, Harris was laid off, leaving Anderson as the only service technician on the night shift. Merritt changed Anderson's schedule back to the day shift in January 2001, but he told Anderson that he would have to remain on call in the evenings until he was able to switch everyone's schedule back to the rotating on call system.

In February 2001, Anderson asked Merritt if he could switch to a part-time, weekend schedule. Anderson made this request because he felt that Merritt was unresponsive to his complaints about his workload, he wanted to look for another job, and he wanted to take information-technology classes. Merritt granted Anderson's request.

That same month, Sears received a notice in the mail that a Sears van with a license plate number of DZF 061 had received two traffic tickets on January 24, 2001, at 9:48 a.m., in downtown Minneapolis, Minnesota. One of the tickets was for parking within 10 feet of a fire hydrant, and the other was for failing to display a current license plate. Sears's support manager, Cari Severson, contacted the fleet coordinator, Mike Thomas, to confirm that the ticketed van was a Sears van. Thomas determined that it was the van that had been assigned to Harris. Sears did not reassign Harris's van to another service technician after Harris was laid off; instead, the van was kept at the Brookdale service center as a spare van that any service technician could use if his assigned van was being repaired.

Thomas conducted an inspection of the ticketed van and found a receipt indicating that Anderson had purchased gasoline with a credit card on January 29, 2001. Thomas turned the receipt over to Severson. Sears also discovered that Anderson did not punch in for work on January 24, 2001, until 10:30 a.m., approximately 40 minutes after the van was ticketed.

Merritt summoned Anderson to his office for a meeting on March 2, 2001. Merritt asked Anderson if he was enjoying his job. Anderson said that he did not like the hours, and that he was not really interested in the job anymore because of all the problems he had had. Merritt asked Anderson why he did not quit; Anderson responded that he needed the money. Merritt then told Anderson that his van had been ticketed. Anderson said he did not remember getting any tickets, and that he would have told Merritt if he had gotten any tickets. Merritt and Anderson went out to the parking lot, where they discovered that the license plate number on the tickets, DZF 061, did not match the license plate number of Anderson's van, 943 MTN.

Merritt and Anderson returned to Merritt's office. Merritt left the office, and returned with a write-up. Merritt told Anderson that he had received the tickets on the spare van, and that Merritt had a gas receipt showing that Anderson had been in the place where the tickets were received. Anderson asked Merritt to show him the evidence, but Merritt did not do so. Anderson "didn't say [he] did or didn't [get the tickets], trying to be totally honest about it. [He] told [Merritt that he] didn't recall any tickets or anything." Anderson felt that he would lose his job unless he said that he got the tickets. According to Anderson:

> [I]f I can keep my job, I'll take the tickets, no big deal, I'll pay for them or whatever. But I'm not going to say that I did it. But I figured it would just be a write-up, and it was really no big deal. And that's where I stood on it, just I'll take the tickets just to keep my job and keep you from saying something to me about it.

Merritt presented Anderson with a write-up, which stated:

> Description of Ethics/Policy Violation(s): Unauthorized use of company vehicle.
>
> * * * *
>
> Consequences of Repeat Ethics/Policy Violation(s): We received 2 citations one for parking to [sic] close to a fire hydrant and failure to display license plate. After reviewing the route this occurred on non-company time at 9:48 AM. Tech

> did not punch in until 10:30 AM. Truck should not be used for unauthorized transportation. Tech is responsible for citation.

Anderson signed the write-up, and Merritt asked him to turn in the keys to his van. According to Anderson, this is when he realized that he had been fired.

Merritt then told him that the van was ticketed in downtown Minneapolis. Anderson responded that "there was no way" he was downtown. Anderson did not "remember ever[] having to go downtown or taking the van and using it for any personal use or anything like that." Merritt gave Anderson a ride home, during which Merritt told him that it would have been easier if he "would have just quit."

Anderson brought this action against Sears in Minnesota state court, alleging that Sears committed unfair discriminatory practices in violation of the MHRA by giving him an excessive workload and discharging him because of his race. The Complaint alleges that "[o]ther similarly-situated individuals outside of the protected class were not . . . adversely affected by workload." With respect to the discriminatory discharge claim, the Complaint alleges that "[o]ther similarly situated individuals outside of the protected class were not terminated," and that "other similarly situated individuals outside the protected class would not have been terminated for an isolated instance of misconduct." It also alleges that Anderson "was replaced by a similarly situated individual outside of the protected class" or "the position remained available to others." Sears removed the action to this Court on the basis of the parties' diverse citizenship. Sears now moves for summary judgment and to strike the affidavit of Harris, which was submitted by Anderson in opposition to Sears's Motion for Summary Judgment.

## III. DISCUSSION

### A. Sears's Motion to Strike Harris's Affidavit

Under D. Minn. R. 7.1(b)(2)(B), a party responding to a dispositive motion generally must serve its opposing affidavits no later than 21 calendar days after it is served with dispositive motion papers. Local rules are binding on the parties to litigation. *Silberstein v. I.R.S.*, 16 F.3d 858, 860 (8th Cir. 1994); *Braxton v. Bi-State Dev. Agency*, 728 F.2d 1105, 1107 (8th Cir. 1984) ("Rules of practice adopted by United States District Courts have the force and effect of law."). In this case, the Magistrate Judge's Pretrial Order states: "All dispositive motions shall be scheduled, filed and served in compliance with Local Rule 7.1. See particularly Local Rule 7.1(b)(2)(A) through (E)."

Sears served Anderson with its Motion for Summary Judgment and related papers on May 6, 2002. Thus, under Local Rule 7.1(b)(2)(B), Anderson had until May 27, 2002, to serve his opposing affidavits. Anderson served Harris's affidavit on September 17, 2002, approximately three-and-one-half months after the 21-day period provided in Rule 7.1(b)(2)(B) had expired, and less than one week before the hearing on Sears's Motion for Summary Judgment. Anderson did not request an extension of the 21-day period for serving opposing affidavits, and did not seek leave to serve an affidavit after that period had expired. Anderson also made no attempt to reach an agreement with Sears for a reasonable extension of the 21-day period.

Anderson argues that Harris's affidavit was timely under Fed. R. Civ. P. 6(d), which states that "opposing affidavits may be served not later than 1 day before the [motion] hearing, *unless the court permits them to be served at some other time*." (Emphasis added.) The timing requirements of Federal Rule of Civil Procedure 6(d) have been modified by Local Rule

7.1(b)(2)(B). *See* 28 U.S.C. § 2701(a) (2000) (granting district courts authority to "prescribe rules for the conduct of their business"); Fed. R. Civ. P. 83(a)(1) ("Each district court, acting by a majority of its district judges, may . . . make and amend rules governing its practice."). Thus, because Anderson did not serve Harris's affidavit within 21 calendar days of service of Sears's Motion for Summary Judgment, Harris's affidavit is untimely.

Anderson argues that Harris's affidavit was not available until September 2002, because Harris lives in Missouri. The fact that Harris lives in Missouri does not excuse Anderson's failure to serve his affidavit within the 21-day period. Furthermore, Anderson supplied Harris's Missouri telephone number in his answers to Sears's interrogatories dated February 4, 2002, demonstrating that Anderson could have contacted Harris and obtained and served his affidavit long before September 2002.

In sum, Anderson has failed to offer a sufficient explanation for his failure to serve Harris's affidavit within the time proscribed by Local Rule 7.1(b)(2)(B). The Court therefore grants Sears's Motion to Strike Harris's affidavit.

**B. Sears's Motion for Summary Judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion,"

and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Harlow v. Fitzgerald*, 457 U.S. 800, 816 n.26 (1982); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1048 (8th Cir. 2002).

The parties agree that Anderson's MHRA claims must be analyzed using the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by subsequent decisions. *See Goins v. West Group*, 635 N.W.2d 717, 724 (Minn. 2001) (stating *McDonnell Douglas* applies to MHRA claims involving disparate treatment and circumstantial evidence of discrimination); *Sigurdson v. County of Isanti*, 386 N.W.2d 715, 721 (Minn. 1986) (holding district courts must apply *McDonnell Douglas* in "employment discrimination cases involving claims of disparate treatment and brought under the [MHRA]"). Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to come forward with evidence of a legitimate, nondiscriminatory reason for its adverse employment action. *Burdine*, 450 U.S. at 254-55; *McDonnell Douglas*, 411 U.S. at 802. If the defendant satisfies its burden, the plaintiff must be afforded the "opportunity to prove by a preponderance

of the evidence that the legitimate reasons offered by the [defendant] were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

1. *Discriminatory Adverse Employment Action—Excessive Workload*

The MHRA prohibits employers from taking adverse employment actions against employees on the basis of race. *See* Minn. Stat. § 363.03, subd. 1(2)(c) (prohibiting employers from discriminating against persons on the basis of race "with respect to hiring, tenure, compensation, terms, conditions, facilities, or privileges of employment"). Anderson claims that Sears violated this prohibition by giving him an excessive workload as compared to his white colleagues. Sears argues that it is entitled to summary judgment on this claim because Anderson has failed to establish a prima facie case of discrimination.

The precise requirements of a prima facie case of discrimination vary depending on the context of the alleged discrimination. *McDonnell Douglas*, 411 U.S. at 802 n.13; *Sigurdson*, 386 N.W.2d at 720. Given the nature of Anderson's claim, he must demonstrate by a preponderance of the evidence that (1) he is a member of a protected class, (2) he was qualified for the position of service technician, (3) Sears took an adverse employment action against him, and (4) similarly situated, nonmembers of his protected class were treated differently. *See Deerson v. Metal-Matic, Inc.*, 423 N.W.2d 393, 396 (Minn. Ct. App. 1988); *Swanigan v. W. Airlines, Inc.*, 396 N.W.2d 607, 612 (Minn. Ct. App. 1986).

There is no dispute that Anderson, an African-American, is a member of a protected class, and that he was qualified to perform the duties of a service technician. At issue is whether

Sears took an adverse employment action against him and, if so, whether Anderson was treated differently than white service technicians.

An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. *Cooney v. Union Pac. R.R. Co.*, 258 F.3d 731, 734 (8th Cir. 2001); *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000). A material employment disadvantage can be exhibited by a reduction in title, pay, benefits, or responsibilities, or by other changes that significantly affect an employee's future career prospects. *Cruzan v. Special Sch. Dist., # 1*, 294 F.3d 981, 984 (8th Cir. 2002); *Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002); *Cooney*, 258 F.3d at 734. Minor changes in working conditions that merely inconvenience an employee are not material employment disadvantages. *Cruzan*, 294 F.3d at 984; *Spears*, 210 F.3d at 853.

Business records submitted by Sears show that Anderson worked approximately 37 hours per week from July 30, 2000, through January 27, 2001.[1] This figure, which takes into account Anderson's regular and overtime hours, is consistent with Anderson's deposition testimony that he "was working pretty much 40 hours a week" from August 2000 to January 2001. Anderson's hours dropped significantly when he was reassigned, at his request, to a part-time schedule in February 2001. Sears's business records indicate that he worked approximately 19 hours per week from January 28, 2002, through February 24, 2002, and Anderson testified that he worked roughly 16 hours per week after he shifted to the part-time schedule.

---

[1] The business records submitted by Sears run from the two-week pay period ending on July 29, 2000, through the two-week pay period ending on March 10, 2001. Because Anderson was hired during the middle of a pay period (July 26, 2000) and discharged during the middle of a pay period (March 2, 2001), the information related to Anderson's workload during his first and last pay periods does not fairly portray the number of hours he typically worked. Accordingly, the Court has not used the information from those two periods in any of its calculations.

With respect to overtime hours, the business records show that Anderson did not log any overtime in 7 of the 15 two-week pay periods during which he was a Sears employee.[2] During the remaining 8 pay periods, Anderson's overtime workload was between 0.5 and 20.5 hours.[3] On average, Anderson worked approximately 4 hours of overtime per week over the course of his employment with Sears.

Most of the evidence submitted by Anderson in support of his position that he had an excessive workload relates to his being on call after his regular shift ended and his receipt of emergency service calls when he was not scheduled to work. At his deposition, Anderson testified that when he worked the night shift, he would remain on call and receive emergency service calls after his shift ended at midnight. He received emergency service calls "throughout the entire day and night" on November 25, 2000, a day on which he was not scheduled to work. When Anderson's request for reassignment to the day shift was granted in January 2001, Merritt told Anderson that he would have to be on call until the schedule was changed back to the old, rotating on-call system. On January 26, 2001, a supervisor told Anderson he would be responsible for emergency service calls until February 1, 2001. The same day, Anderson received two emergency service calls and was told "he would have to deal with [Merritt]" if he did not respond to the calls. Anderson refused to respond to the calls because he believed it was his day off. Anderson testified that Merritt "said something" to him about his refusal to respond

---

2 Sears's business records contain two categories of overtime hours: "Overtime" and "Adjust Overtime." Viewing the evidence in the light most favorable to Anderson, the Court has added the hours listed in these two categories to calculate his overtime hours. Anderson did not work any overtime hours during the pay periods ending on August 12, 2000, August 26, 2000, September 23, 2000, October 21, 2000, December 2, 2000, January 13, 2001, and February 10, 2001.

3 In particular, Anderson worked 20.1 hours, 8.1 hours, 20.5 hours, 0.5 hours, 3 hours, 1.3 hours, 10.1 hours, and 2 hours of overtime during the remaining 8 pay periods.

to the calls, but he was not written up for it. After Anderson switched to a part-time schedule, he was required to be on call "almost every other weekend."

Anderson also testified that Sears's method of tracking productivity did not give him credit for all of his work. According to Anderson, Sears's computer system automatically tracked service calls received during the day, but did not track service calls received during evening hours. Because many of Anderson's calls came in during the evening hours, this system made him appear less productive in relation to the other service technicians. Anderson testified that Merritt talked to him about his lack of productivity "from time to time," but he was never written up for it.

Citing *Delashmutt v. Wis-Pak Plastics, Inc.*, 990 F. Supp. 689 (N.D. Iowa 1998), Anderson argues that this evidence is sufficient to raise a genuine issue of fact as to whether Sears took an adverse employment action against him. In *Delashmutt*, the United States District Court for the Northern District of Iowa concluded that "a jury question is certainly engendered on whether essentially doubling a person's workload for more than a brief period" constitutes an adverse employment action. *Id.* at 700.

The evidence submitted by Anderson in this case does not come close to showing that Sears "essentially doubl[ed]" his workload, nor does it indicate that he experienced any significant increase in his workload at all "for more than a brief period." The average number of hours Anderson worked per week as a night-shift service technician was roughly the same as the hours he worked as a day-shift service technician. Anderson's responsibilities—responding to service calls from Sears's customers—remained constant throughout his employment with Sears. Although the Court must assume for purposes of this motion that Anderson was typically required to be on call after his night shift ended and that he did not get credit for his evening

service calls, these conditions do not rise to the level of a material employment disadvantage. Anderson's assignment to the night shift was temporary, lasting only from November 2000 to January 2001. Moreover, Anderson's assignment to the night shift did not result in a diminution of his title, pay, or benefits. On the contrary, Anderson chose to switch to the night shift in exchange for a raise of $2 per hour, a 12% over his prior wage.

Based on these considerations, the Court concludes that Anderson has not submitted evidence sufficient to create a genuine issue of fact as to whether Sears took an adverse employment action against him by assigning him an excessive workload. Because Anderson cannot establish an essential element of his claim, Sears is entitled to judgment as a matter of law.

2. *Discriminatory Discharge*

Anderson's second claim is that Sears violated the MHRA by discharging him because of his race. *See* Minn. Stat. § 363.03, subd. 1(2)(b) (prohibiting employers from discharging employees on the basis of race). Sears argues that Anderson cannot establish a prima facie case of discriminatory discharge. In the alternative, Sears argues that Anderson's misuse of company property constitutes a legitimate, nondiscriminatory reason for his discharge, and that Anderson cannot show that this reason is a pretext for racial discrimination.

To establish a prima facie case of discriminatory discharge, Anderson must demonstrate by a preponderance of the evidence that (1) he is a member of a protected class, (2) he was qualified for the position of service technician, (3) he was discharged, and (4) the discharge occurred under circumstances from which unlawful discrimination can be inferred. *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994); *Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989). Although the showing required to satisfy the final

element depends on the circumstances of the alleged discrimination, it is clear that evidence that the plaintiff was replaced by a nonmember of the protected class, *Goins*, 635 N.W.2d at 724; *Feges v. Perkins Rests., Inc.*, 483 N.W.2d 701, 711 (Minn. 1992), or that similarly situated, nonmembers of the protected class were not discharged for the same behavior, *Deerson*, 423 N.W.2d at 396; *Swanigan*, 396 N.W.2d at 612, is sufficient.

Only the fourth element is at issue in this case. Anderson contends he has satisfied the fourth element by showing that Sears replaced him with a nonmember of his protected class. Anderson relies on Sears's answers to interrogatories, in which Sears indicated that none of the service technicians employed by Sears and supervised by Merritt as of March 2002 were African-American. These answers, which relate solely to the racial composition of Sears's work force one full year after Anderson was discharged, do not speak to whether Anderson was replaced or, if he was replaced, whether that replacement was a nonmember of his protected class. The only other evidence in the record on this point is a paragraph in Anderson's affidavit, in which he states, "to my knowledge no African-American was hired to replace me, though I do not have the specific information since I was no longer at Sears." By its own terms, this statement demonstrates that Anderson does not know whether Sears replaced him with a nonmember of his protected class. In sum, Anderson has not satisfied his burden of demonstrating that Sears replaced him with a service technician outside of his protected class.

Even more damaging to Anderson's claim is the fact that Sears discharged three white service technicians for misuse of company property; the same reason offered by Sears for its discharge of Anderson.[4] Anderson argues that he is not similarly situated to the other discharged

---

4 Anderson argues that at least one of these service technicians was discharged for reasons other than misuse of company property. In support of this argument, Anderson submitted an affidavit from one of the discharged service technicians which states, "I was informed that the

service technicians because he did not actually misuse company property. Anderson denies using the spare van that received the tickets on January 24, 2001, and he has submitted service records from a garage in Brooklyn Center, Minnesota, showing that a Sears van assigned to one of the other service technicians was being repaired on January 24. According to Anderson, it was this other service technician who used the spare van for personal use on January 24.

Viewing the evidence in the light most favorable to Anderson, as it must, the Court assumes that Anderson did not receive the tickets, and that he therefore did not actually misuse company property. Nevertheless, at the time Anderson was discharged, Sears possessed evidence indicating that Anderson had done so. For example, when Sears searched the ticketed van, it found a receipt from Anderson's credit card dated January 29, 2001. The presence and the date of the receipt indicated that Anderson used the van around the time it was ticketed. Furthermore, as noted on Anderson's termination notice, Sears knew that Anderson did not punch in for work on January 24, 2001, until 10:30 a.m., approximately 40 minutes after the time stamped on the tickets. When Merritt asked Anderson about the tickets, Anderson offered to pay them, and he would neither admit nor deny that he had received them.

Given the evidence linking Anderson to the tickets, and given Anderson's failure to unequivocally deny that he had received the tickets at any time prior to his discharge, the Court concludes that Anderson has failed to distinguish himself from the other service technicians who were discharged for misuse of company property. *See Ward v. Procter & Gamble Paper Prods.*

---

(Footnote continued from previous page.)

reason for my termination was not because of misuse of a company vehicle but because the van was present at a location where they served alcoholic beverages." Anderson's argument holds up only if using a company vehicle as a means of transportation to "a location where they serve[] alcoholic beverages" does not constitute a misuse of the company vehicle, a position that, in the Court's sober opinion, is not persuasive.

*Co.*, 111 F.3d 558, 560 (8th Cir. 1997) (stating that "[e]mployees are similarly situated when they 'are involved in or accused of the same offense'") (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (citations omitted)). Because Anderson has failed to submit evidence substantiating the fourth element of his discriminatory discharge claim, Sears is entitled to summary judgment on this claim, as well.

## IV. CONCLUSION

Based on the files, record, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant Sears's Motion to Strike the Affidavit of Harris [Doc. No. 23] is GRANTED.

2. Defendant Sears's Motion for Summary Judgment [Doc. No. 13] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: November 8, 2002

JOAN ERICKSEN LANCASTER
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*